UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

FLYING STAR CAFES, INC.,                                        Case No. 15-10182 t11

    Debtor.

## OPINION

Before the Court is 3rd and Gold, LLC's motion for allowance of an administrative expense claim. Debtor rejected a lease with the Claimant pursuant to 11 U.S.C. § 365,[1] and the motion seeks for allowance of post-petition rent, insurance, property taxes, repairs, and other charges and expenses. After considering all evidence and arguments, the Court will allow Claimant's administrative expense claim in the amount of $29,991.15.

### I.    FACTS[2]

Debtor owns and operates a group of restaurants called Flying Star Cafés. At one time, there were nine Flying Star locations in New Mexico. Debtor developed several of the properties, including retail shopping centers that housed the restaurants, shortly before the 2008 recession. The severe economic downturn, among other problems, took their toll on Debtor. Debtor was forced to file this chapter 11 case on January 30, 2015.

---

[1] Unless otherwise noted, all statutory references are to 11 U.S.C.
[2] In makings its findings, the Court took judicial notice of the docket. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may *sua sponte* take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) (citing Fed. R. Evid. 201 and concluding that "[t]he bankruptcy court appropriately took judicial notice of its own docket").

On or about June 23, 2003, Debtor entered into a commercial lease[3] with Infill Solutions Development LLC as landlord. Infill Solutions assigned its interest in the Lease to Wellesley Partners, LLC later that year. Wellesley Partners assigned the Lease to Claimant in 2012.

The leased premises were the first and second floor of a two-story building at 723 Silver Ave. SW, Albuquerque, NM 87102 (the "Building"). The basement of the Building was not leased to Debtor and remained unoccupied before 2013 or 2014.

The Lease required Claimant to maintain the roof, foundation, exterior walls, and basement of the Building. Debtor's maintenance obligations were:

> Tenant shall keep the Demised Premises and the Common Areas in a good, clean condition and shall at its sole cost and expense keep the Demised Premises and the Common Areas free of insects, rodents, and other pests, and will make all needed repairs and replacements, including replacement of cracked or broken glass; doors, and other frames, moldings, locks, and hardware; lighting and electrical fixtures, wiring and installations; heating, air conditioning, and plumbing systems, ducts, and fixtures exclusively serving the Demised Premises; and interior painting and other interior treatment of all walls and floors. Tenant shall keep the Demised Premises and the Common Areas in good repair and condition. If any repairs required to be made by Tenant are not timely made by Tenant, Landlord may at its option and following ten (10) days notice to Tenant, make such repairs … and Tenant shall pay the Landlord upon demand as additional rental hereunder the cost of such repairs plus interest at the rate of twelve percent (12%) per annum from the date of payment by Landlord until repaid by Tenant….

Lease, Article 11.2. In addition, a 2006 lease amendment transferred roof maintenance to Debtor, and required Debtor to ensure that there were no water leaks into the basement.

The Lease also obligated Debtor to: (a) provide all electric, gas, water, telephone, and sewer services for the Building (Article 14); (b) pay all property taxes for the Building (Article 15); and (c) insure the Building (Article 16). If Debtor failed to pay any amount due under the Lease within

---

[3] With all attachments and amendments, the "Lease."

ten days after Claimant provided a written notice of default, Claimant was entitled to a 5% late fee.

Debtor discharged its maintenance duties between 2003 and 2015. Debtor employed its own maintenance crew to make repairs, remove graffiti, and remove pigeon debris from the roof.

In 2013 or 2014, Claimant rented the basement of the Building to HealthQuest Chiropractic. Claimant installed or began using separate gas and electric meters for HealthQuest. It is unclear whether Claimant or HealthQuest paid the utility charges, but Debtor was not asked to do so. Debtor paid its own utility charges directly, and did not know of HealthQuest's utility billing arrangements.

After HealthQuest moved in, and likely to keep HealthQuest happy, Claimant began performing repairs and maintenance that Debtor historically had done. Post-petition, this included elevator maintenance, graffiti removal, air conditioning maintenance, and exterior clean-up. When HealthQuest's air conditioning unit stopping working in the summer of 2015, for example, Claimant spent over $8,000 removing large quantities of pigeon "debris" from the unit and the roof.

Debtor had plumbing problems during its entire tenancy. In 2005 or 2006 Debtor replaced all sanitary sewer pipes and portions of the sewer system. The pipes still leaked, so in 2012 Debtor performed much of the work again, this time replacing the pipes in the basement. Nevertheless, in the spring and summer of 2015 waste water leaked from the restaurant into the basement, at one point causing a serious problem. Claimant forgave $4,000 in rent owed by HealthQuest for June-August 2015 to compensate HealthQuest for the resulting sewage smell. Claimant also spent nearly $8,000 in October 2015 repairing damage in the basement caused by the leaks. Debtor did not learn about the rent abatement or the repairs until after the fact.

Despite these problems, Claimant only sent one default notice to Debtor, a letter from counsel dated March 25, 2015. In the letter, counsel demanded that Debtor repair the plumbing to avoid more water leaks. The letter contained the ten-day notice required by Article 11.2. Claimant's property manager testified that, from time to time, she communicated with Debtor's personnel about needed repairs and maintenance, but apparently she did not do so with formal notices.

After Debtor's bankruptcy filing, Claimant likely decided not to enforce certain Lease rights because it wanted to keep Debtor as a tenant. Debtor expressed its intention to assume the Lease shortly after filing the case, and the parties began negotiating new lease terms. On May 21, 2015, the Court entered an order extending the deadline to assume or reject commercial leases until August 31, 2015, doc. 111. Debtor filed a motion to assume the Lease on August 11, 2015. The Unsecured Creditors' Committed (the "UCC") objected.

After conferring with the UCC and analyzing its business operations, Debtor determined that the restaurant at the Building was not viable. In October 2015, Debtor prepared to vacate the Building. By an email dated October 5, 2015, Debtor's controller asked the property manager about past due rent:

> Can you check our account and let me know if there is a past due rent amount that was owed? I feel like there was an amount from earlier in the summer when we had that confusion about what exactly we were supposed to pay, and I want to make sure we are all caught up. Thanks.

The property manager responded a day later: "The current balance for miscellaneous unpaid rent is $1,670.04. Once that is paid off, you'll have a zero balance." The emails did not mention any amounts owed for repairs, maintenance, rent abatements, etc.

On October 12, 2015, Debtor sent notice to the property manager that it would not assume the Lease, and that it intended to vacate the property by October 31, 2015. Debtor moved out on

-4-
Case 15-10182-t11    Doc 577    Filed 12/23/16    Entered 12/23/16 13:06:57 Page 4 of 13

that date. The Court entered a stipulated order withdrawing the motion to assume on November 18, 2015. Debtor's counsel prepared the order, which Claimant's counsel approved. The decretal portions states that "Debtor is hereby deemed to have rejected said lease."

After Debtor moved out, Claimant asserted an administrative expense claim of $71,468. Claimant later amended the amount to $68,504.47, broken down as follows:

| Claim | Amount |
|---|---|
| Rent | $ 7,369.86 |
| Insurance | $ 935.04 |
| Property taxes | $11,839.06[4] |
| Maintenance and repairs | $21,399.35 |
| Utilities | $ 5,999.80 |
| HealthQuest Rent abatement | $ 4,000.00 |
| Attorney fees | $14,386.61[5] |
| Late Fees | $ 2,226.50[6] |
| Interest | $ 348.25 |
| Total | $68,504.47 |

In its calculations, Claimant included 12% interest on all repairs and maintenance, and a 5% late charge on all other amounts.

## II. DISCUSSION

### A. Administrative Priority and Post-Petition Lease Obligations.

Debtors' post-petition obligations under an unexpired lease for non-residential real property are governed by § 365(d)(3), which provides:

---

[4] As discussed below, that figure increased slightly based on the parties' stipulation. For continuity, Court will use the original figure when referring to the total amount of the claim.

[5] The claim for attorney's fees is based on Article 21.2 of the Lease: "If at any time during the term of this Lease, either Landlord or Tenant shall institute any action or proceeding against the other relating to the provisions of this Lease, or any default . . . the unsuccessful party shall be responsible for the reasonable expenses of attorney's fees and disbursements incurred therein by the successful party."

[6] The Court calculated this figure by multiplying the total amount of non-repair/maintenance charges ($44,898.86) by 5%. Although the result differs slightly from Claimant's calculations, the difference does not matter because the late charges are not entitled to administrative priority.

> The trustee[7] shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title.

If the debtor fails to perform its obligations, this section "gives lessors a priority claim similar to an administrative expense claim under § 503(b)(1)." *In re Furr's Supermarkets, Inc.,* 283 B.R. 60, 65 (10th Cir. BAP 2002); *In re GCP CT Sch. Acquisition, LLC,* 429 B.R. 817, 824 (1st Cir. BAP 2010) ("§ 365(d)(3) requires the trustee to perform timely all obligations required under the lease, and gives the lessor an administrative claim for such amounts."). A majority of courts, including the Tenth Circuit BAP, have held that landlords are not required to prove a benefit to the estate to establish the amount of their administrative claim, but are instead "entitled to current payment of the amounts required under their leases." *Furr's Supermarkets, Inc.,* 283 B.R. at 65. *See also In re Pettingill Enterprises, Inc.,* 486 B.R. 524, 532 (Bankr. D.N.M. 2013) (citing and following *Furr's*); *In re Duckwall–ALCO Stores, Inc.*, 150 B.R. 965, 971 n. 10 (D. Kan. 1993) ("Lease obligations under § 365(d)(3) are not subject to requirements of § 503 for payment of administrative expenses"); *In re Stone Barn Manhattan LLC*, 398 B.R. 359, 367 n. 5 (Bankr. S.D.N.Y. 2008) (same); 3 *Collier on Bankruptcy* ¶ 365.04[1][b] (16th ed. 2011) (collecting cases). The Court agrees.

   B.   <u>Rejection Date</u>.

At trial, Debtor asserted it owes nothing because the Lease was rejected by operation of law on August 31, 2015, the deadline to assume or reject non-residential real property leases, and that any charges thereafter did not benefit the estate. This argument is overruled.

---

[7] In this case, the debtor in possession had all of the rights and obligations of a trustee. 11 U.S.C. § 1107(a).

Ordinarily, debtors must to decide whether to assume or reject a lease within 120 days after the petition date. Section 365(d)(4)(A) provides:

> [A]n unexpired lease of nonresidential real property under which the debtor is the lessee shall be deemed rejected, and the trustee shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of—
>
> (i) the date that is 120 days after the date of the order for relief; or
> (ii) the date of the entry of an order confirming a plan.

The deadline can be extended for cause if an order is entered before the expiration of the 120-day period. 11 U.S.C. § 365(d)(4)(B)(i).

Here, the deadline was extended to August 31, 2015, and Debtor filed the motion to assume within the extended deadline. Debtor argues that because the Court did not approve the proposed assumption by August 31, 2015, the Lease was rejected by operation of law on that date. This argument is unavailing. To comply with § 365(d)(4), the debtor must file a motion to assume within the deadline; it need not obtain an order granting the proposed assumption. *In re Victoria Station, Inc.,* 840 F.2d 682, 684 (9th Cir.1988) (there is no express limit to the time within which the bankruptcy court must hear and decide a motion to assume that is timely filed); *In re R. Ring Enterprises, Inc.*, 2009 WL 779800 (Bankr. N.D. Cal. 2009) (*Victoria Station's* holding not changed by BAPCPA); *In re Amerlink, Ltd.,* 2009 WL 2497776, * 3 (Bankr. E.D.N.C.) ("If Congress had intended that a debtor obtain an order approving the assumption … within the 120-day period, rather than the mere filing a motion to assume the lease within that time, such language could have been included in 11 U.S.C. § 365(d)(4)(A)"). The rejection date therefore is November 18, 2015.

C. Claim Amounts Entitled to Administrative Priority.

1. <u>Rent</u>. Under the Lease, Debtor is clearly obligated to pay pro-rated rent for Nov. 1-18, 2015 ($7,369.86).

2. <u>Insurance</u>. The same is true of Debtor's obligation to pay pro-rated Building insurance ($935.04).

3. <u>Property Taxes</u>. Debtor stipulated that pro-rated property taxes ($12,893.85)[8] are allowable as an administrative expense.

4. <u>Maintenance and Repairs</u>. Claimant seeks repayment of $21,399.35 in maintenance and repair costs. Under the Lease, Debtor was responsible for certain repairs and maintenance Claimant performed. However, before Claimant could do the work itself and charge the cost to Debtor, Claimant was required to give Debtor notice and 10 days to cure the default.[9] Claimant only provided one notice, dated March 25, 2015, demanding that Debtor make all repairs necessary to prevent water leaks. Claimant subsequently spent $196.61 on May 14, 2015 to "[c]lean-up water leaks in basement caused by Flying Star's kitchen floor." It is not clear that the charges relate to the notice letter, but they are close enough in time and subject matter for the expenses to be allowed.

Claimant incurred other expenses related to water leaks, namely $7,012.18 incurred on October 8, 2015 for "restoration of basement from leaking pipes caused by Flying Star's grease trap," and $909.50 for "repair of partition wall." These expenses are too far after the March 25,

---

[8] The parties stipulated to this figure in the order confirming Debtor's plan of reorganization. The figure differs slightly from the one in Claimant's trial exhibit.

[9] The Lease does not require the notice under Article 11.2 to be in writing. However, there is no evidence that Claimant or its property manager gave oral notice with a 10-day cure period. At most, the property manager had informal conversations with Debtor's representatives about repair and maintenance issues.

2015 letter to be considered part of that notice. Rather, it appears that the money was spent fixing problems caused by a leak that occurred in the summer of 2015.

None of the other maintenance and repair charges appear to have been preceded by a 10-day notice, so they are not allowable.

     5.    <u>Utilities</u>. Next, Claimant seeks $5,999.80 in utility charges. It is unclear whether the charges were for Debtor's utilities or HealthQuest's. Based on Jean Bernstein's testimony that she paid all of Flying Star's utilities through October 31, 2015, and the lack of contrary evidence, the Court finds all charges before that date stem from HealthQuest's separate utility meters. The amounts and dates of the following charges suggest they are traceable to Debtor: $1,500 to Albuquerque Water Authority on 11/2/15; $667.87 to PNM on 11/17/15; and $87.96 to NM Gas Co. on 11/19/15. The Court will allow these amounts as administrative expenses.

The other charges appear to be for utility services provided to HealthQuest. The Lease language is somewhat ambiguous about whether Debtor must pay for HealthQuest's utilities. Such a requirement would be highly unusual for a commercial lease. Before learning that Debtor was going to reject the Lease, Claimant never asked Debtor to pay HealthQuest's utilities. Claimant began using separate utility meters after HealthQuest moved in and paid those charges (or more likely, had the tenant pay them) for over a year without telling Debtor or making any demand for repayment. The Court concludes that Claimant waived whatever right it might otherwise have had to recover HealthQuest's utility charges, and is estopped from collecting such amounts. *See Atherton v. Gopin,* 272 P.3d 700, 703 (N.M. App. 2012) ("waiver by estoppel is present where a party's actions reasonably lead the other party to believe waiver has occurred and that other party is prejudiced by the belief"); *J.R. Hale Contracting Co. v. United N.M. Bank at Albuquerque*, 799

-9-
Case 15-10182-t11    Doc 577    Filed 12/23/16    Entered 12/23/16 13:06:57 Page 9 of 13

P.2d 581, 586 (1990) ("the intent to waive contractual obligations or conditions may be implied from a party's representations that fall short of an express declaration of waiver, or from his conduct").

      6.    HealthQuest Rent Abatement. Claimant asserts Debtor is liable for the $4,000 rent abatement given to HealthQuest. Claimant relies on a consequential damages theory, arguing that the abatement was a natural consequence of Debtor's failure to keep the plumbing in good repair. Consequential loss is defined as a "a loss arising from the results of damage rather than from the damage itself." *Primetime Hospitality, Inc. v. City of Albuquerque,* 206 P.3d 112, 120 (N.M. 2009). "[C]onsequential damages must be the natural and foreseeable consequences of the breach." *First Nat. Bank in Albuquerque v. Sanchez,* 815 P.2d 613, 618 (N.M. 1991).

Consequential damages may not be available under § 365(d)(3). In *In re Ernst Home Center Inc.*, 209 B.R. 955 (Bankr. W.D. Wash. 1997), for example, the court pointed out that by its plain language, § 365(d)(3) only imposes a duty to perform "obligations" under the lease, not to pay all amounts due. *Ernst* also cited the legislative history that the section was enacted to "[e]nsure that debtor-tenants pay their rent, common area, and other charges on time" so the landlord is not "forced to provide current services …without current payment." *Id.* (quoting 130 Cong. Rec. § 8894–95 (daily ed. June 29, 1984)). *See also In re R.H. Macy & Co., Inc.,* 170 B.R. 69 (Bankr. S.D.N.Y. 1994) (consequential damages stemming from debtor-lessor's breach of lease were not entitled to administrative status).[10] These cases are consistent with the notion that administrative priorities should be narrowly construed "because the presumption in bankruptcy

---

[10] *But see In re Central Illinois Energy, LLC.,* 2011 WL 61171 (Bankr. C.D. Ill.) (declining to grant summary judgment on Claimant's administrative expense application and analyzing whether the consequential damages arose from debtor's alleged breach of a repair and maintenance clause).

-10-

cases is that the debtor's limited resources will be equally distributed among [the] creditors." *In re Amarex*, 853 F.2d 1526, 1530 (10th Cir. 1988).

The Court does not need to rule on whether consequential damages are allowable under § 365(d)(3), because Claimant has not demonstrated that such damages should be allowed here. First, there was no formal notice of repairs needed for the summer, 2015 water leak, or that Claimant intended to charge Debtor for $4,000 in rent abatement given to HealthQuest. Second, although Debtor's improper maintenance of the sewage pipes and drains might have caused the mess, it is just as likely that the Building's and/or City's wastewater systems were not equipped to handle a busy restaurant. Debtor tried in earnest to fix the water leak problem; it simply was never successful. Third, Claimant bears some responsibility for the rent abatement. Claimant knew about Debtor's problematic sewer system and elected to lease office space to a chiropractor right below the restaurant's kitchen. Under these circumstances, the Court concludes that the $4,000 rent abatement charge is not allowable under § 365(d)(3).

7. <u>Attorney's Fees</u>. Claimant seeks $14,386.61 in attorney's fees based on Article 21.2 of the Lease, which requires the unsuccessful party to pay the fees of the successful party following any action on the Lease. The Lease does not define what it means to be the "successful" or "unsuccessful" party. The Court will apply the ordinary meaning to success, which is to achieve a favorable or desirable outcome. *See* Merriam Webster's Collegiate Dictionary (10th ed. 1998). Claimant sought $54,117.86, excluding attorney's fees, and will be awarded $23,661.04 in non-attorney fee charges, or 44% of the asserted claim. The Court finds that Claimant achieved a favorable outcome to that extent, and will award 44% of the requested attorney's fees ($6,330.11).

8. <u>Late Fees</u>. Claimant asks the Court to add a 5% late fee on all allowed expenses pursuant to Article 10.1 of the Lease. Late fees can only be collected where Claimant gave Debtor a prior written notice of default. No such notices were given, so Claimant is not entitled to any late fees.

9. <u>Interest</u>. Finally, Claimant asks the Court to award interest of 12% on the repair costs under Article 11.2 of the Lease. Interest can only be collected if Claimant gave Debtor a notice of default. Claimant is entitled to interest on the $196.61 in expenses incurred after the March 25, 2015 notice was given, but not to any additional amounts.

### III. <u>CONCLUSION</u>

Claimant is entitled to an administrative expense claim as follows:

| Claim | Amount |
| --- | --- |
| Rent | $ 7,369.86 |
| Insurance | $ 935.04 |
| Property taxes | $12,893.85 |
| Maintenance and repairs | $ 196.61 |
| Utilities | $ 2,255.83 |
| HealthQuest Rent abatement | $ 0 |
| Attorney fees | $ 6,330.11 |
| Late Fees | $ 0 |
| Interest | $ 9.85 |
| Total | $29,991.15 |

The Court will enter a separate order granting Claimant's application to that extent.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: December 23, 2016

Copies to:

Shay Elizabeth Meagle
Attorney for the Debtor
P.O. Box 27407
Albuquerque, NM 87125-7407

Patrick J Griebel
Attorney for 3rd and Gold
1000 Gold Avenue SW
Albuquerque, NM 87102